Good morning, Your Honors. Good morning. Joseph Chang on behalf of Ronald and Phyllis DeLuca, the plaintiff-appellant homeowners in this matter. There's so many issues in this case, we didn't give you enough time. But as you can see, we're not that judicious about watching the clock, the number of things here that we need to discuss. So why don't you go ahead. At the beginning, I mean, the claim against Quicken. I'm sitting there saying, you've got, what did you plead against Quicken? Because it seems like you've got a perfectly good claim at the outset. The question is, did you plead it? They make $80,000. Reportedly, the person tells them to say that they're making $240,000. So they get a $672,000 loan. But the court is saying, you know, you had a chance to amend, right? Yes. You did amend. That is correct. And the court found what problems? The court looked at this through the ICBAL. They conducted the ICBAL test. It hasn't had to. Correct. And they felt that the pleadings did not rise to the level that ICBAL required. And I think looking at the exchange between you and the court, for a lot of the pleadings that the court went through with you and the conclusions of law that are in the complaint, that you actually agreed with the concerns that the court was raising, that there were conclusions of law and not allegations under ICBAL and TROMBE. Chief Judge, I'd like to bring something to your attention. There was a calendaring issue, which was my fault, where state practitioners were not used to being before the federal bench. And because of that, I was actually quite late to court, and I hadn't prepared the way I really wanted to. So that has a lot to do with why the transcript read the way that it did. But you still had a chance to amend the complaint. That is true. And you claim that Quicken lured them into an unfavorable loan agreement, but then didn't describe how the agreement was unfavorable in this context. I mean, that's what the court was saying. And then the causal relationship is that you noted the only loss mentioned was a default on the mortgage, but that the complaint didn't explain how Quicken's alleged fraud caused them to default. So it really is a plea. We're stuck in pleading here. Part of it seems to be a fraud on Quicken, not a fraud that Quicken committed. But if we take your allegations as true, as we must at this point, to the extent that there's a factually specific allegation there, it seems that you're really alleging a fraud on Quicken that was perpetrated by Mison and some other folks that jacked up, overstated the assets, and understated the amount of the amortization requirements. That is true. And unfortunately, the DeLucas are now in a position where they're living in their home. They've been there for many years. And because of this alleged fraud, they're not comfortable in their homes. They don't know when a foreclosure proceeding might begin. And there has been no exchange of discovery whatsoever. This case was also initially filed in Burden County, New Jersey, and was removed to federal court. I think that's an important issue to bring up because they were prepared for a state law claim. And under the New Jersey Consumer Fraud Act, the court's looking through the eyes of the average consumer. Now, the DeLucas, they were running an auto body, a mechanic shop, for several years. So I think they're the average American consumer in this case. Well, the average American consumer could not run, at least maybe I shouldn't speak that broadly, I could not imagine running an auto body shop. I just got a Prius and I'm still trying to figure out how do I know when it's running. So the degree of sophistication I think is substantially greater than is alleged in the briefs. These are folks who are familiar with financing, not real estate financing, the intricacies that might be unique to real estate financing, but in terms of debt obligations, amortization, those kinds of things. We're not talking about someone, even though there's a high school education, we're not talking about totally unsophisticated, naive persons that are unfamiliar with aspects of financing. I'm assuming that there was financing involved in the businesses, but we're going to be on the record here and that's not really appropriate. Well, Chief Judge, that's a very interesting point. In my reading of the Consumer Fraud Act, and when I take a look at the model jury charges, the way I look at the New Jersey CFA is that you're looking through the eyes of the average consumer, not necessarily through the eyes of the plaintiff in the case. And then once you do that, and I acknowledge your remarks, they are running a business, so there is some heightened sophistication there. But I think we're going in the wrong direction if we're conducting that type of analysis. It's not so easy to figure out what the average consumer is, and I guess that's going to be realized on a case-by-case basis. But I do argue that in this particular case, the level of sophistication that might have been analyzed for this ruling on the motion to dismiss was not reasonable. In plain language, what does City Mortgage do wrong? They're a loan servicer, right? Your Honor, City Mortgage was initially, I believe they were the originating lender on, well, no. I apologize. Quicken was, and then Quicken. Quicken was the originating lender. So City Mortgage was a servicer, and they were trying to get them into, you know, suggesting that you need to apply to try to get, in effect, what would come out as a result as a modification. So what did they do wrong? I think the most powerful allegation with respect to that is being told, and I believe this is an unconscionable business practice, being told to default. And that would then kick-start your ability to apply for HAMP or other in-house money. Well, I mean, put yourself in the City Mortgage person's shoes. You've got a couple before you that, as we would say where I grew up, ain't no way they're going to be able to pay a mortgage for $672,000. And in order to try to get a modification, to get some type of relief, they're going to default sooner or later. So the person's probably thinking, you know what, just have them default now. Let's acknowledge what clearly is going to happen. They can't afford this. Now, maybe, you know, what they should have done was, you know, filed for bankruptcy, let the house be taken, et cetera. But it sounds like they wanted to keep their house. So the City Mortgage person, you know, perhaps goes beyond the book of what the person should say and says, look, here's the only thing I can think of. Because at this point, the plaintiffs didn't have an attorney, did they, when they met with City Mortgage, or did they? I don't believe so, Your Honor. Okay. So, you know, maybe the person should have said, you need to see an attorney like now. But the person at City Mortgage didn't do that. So what did the City Mortgage person do that was a violation of law, of state law? I think just making that statement when you're, you know, being directed to default. And I understand there might be situations where that might be a blessing in disguise to be told that. It might be, you know, having that cup of coffee that you should have had months ago. But the problem is, once you default, a lot of these individuals that are going through the foreclosure issue, they're going paycheck to paycheck with respect to income. So if they're defaulting, and then all of a sudden the arrearage is astronomical, you know, from one month to another month. So if you're being told default, and even looking at this from a Chapter 13 perspective, where you have a chance to get current again through bankruptcy code, if you're not making these right decisions timely, so if you're defaulting today, and then for some reason you're not well prepared, and you don't file Chapter 13 quickly enough, the arrearage and then the payment plan that you're supposed to pay back might be impossible. Well, that's what happened here. They ended up with the amortization of interest of $70,000. Is that right? It quickly grew out of control, Chief Judge. So, you know, I do state that simply by city mortgage telling them to default, you know, without telling them, look, make sure to go seek counsel. How could they afford counsel? And these are folks that are really up against the wall. They're trying their best to hang on to their home. They've got this ridiculous payment scheme under the TTP loan that they've gotten, under the three trial payments, to qualify for the new payment deal. I don't know what could they afford. I mean, if that were me, and someone told me to see an attorney, so fine, you pay for the lawyer, and I'll be happy to go see the lawyer. But that doesn't help us in terms of your claim, and whether or not a claim has been stated with sufficient specificity against Quicken. Now, you mentioned the shuttling back and forth from one rep to another rep. Was that Quicken that you're saying did that, or was that city mortgage? That's Quicken. That's Quicken. And also, I'd like to bring to your attention the fact that we have two loans here at Origination. You have an 80 percent loan and then a 20 percent loan. So, in essence, the homeowner— What are the percentages? I thought it was 6.7 and 9 point something. That's with respect to the interest rate, but in terms of the overall loans that were offered, there was an 80 percent and then a 20 percent loan that, when I look at this, it's clearly a way to deceptively provide a down payment. Now, I have no reason to believe, since there's been no discovery exchanged, that Quicken may or may not have perceived the 20 percent loan as a down payment, and that's why it's so important to have discovery in this particular case. I feel that it's deceptive because if the homeowner didn't have a down payment, oh well, it doesn't matter. Give them a 20 percent line of credit. Give them a HELOC. Give them the 20 percent where they're going to be perceived as having the equity that all banks want. Did you save time for rebuttal? If I didn't, I wanted to save five minutes. I'm not sure if I've gone over that. We'll give you some latitude. Okay. I'm sure we'll have some more questions for you after your colleagues are finished. Okay. Thank you. We never really did get the city mortgage. We focused on Quicken. Go ahead. Okay. Thank you. May it please the Court. Josh Howley from Sills, Cummins & Gross on behalf of the Appellee City Mortgage. Your Honors, this is not a typical mortgage fraud case. City Mortgage made the plaintiffs three separate permanent modification offers out of the HAMP program, all of which the plaintiffs rejected as too expensive or not affordable. Nevertheless, despite City Mortgage's good faith in offering them permanent loan modifications, the plaintiffs then sued City Mortgage, alleging fraud, consumer fraud, breach of contract, and estoppel. You mentioned good faith, but the loan modifications you offered them I think were something like $60,000 a year total payments. And this is a couple whose income for the year is $80,000. Your Honor, I'm not sure that that fact is actually in the record. I don't believe that. I thought it was pledged. Is that pledged? I don't believe it was pledged, Your Honor. Okay. And it's part of the reason that goes to the insufficiency of the pleading. The plaintiffs in their Fraud and Consumer Fraud Act claims, they base them on two factual allegations, one of which is that City Mortgage told the plaintiffs to default in order to be qualified for a HAMP modification. The HAMP program requires that the plaintiffs submit a hardship affidavit in which they must affirm under oath that they are either in default or about to go into default. So, Your Honor, I would submit that that is not a misrepresentation, but in fact is consistent with what the HAMP program requires. In addition... On the pleading level, the allegation was that City Mortgage fraudulently induced the plaintiffs here, the Delucas, to enter into a default and misrepresented that they would receive a favorable loan. So that's a fraud claim. And it would seem that that fraud claim, you're saying that somehow it's preempted, but fraud claims are not preempted by HAMP. At least most courts have held that. None that I know of that have held it otherwise. Your Honor, getting beyond the decision to dismiss for failure to state a claim, Judge Chesler also concluded that the claims were preempted by HAMP based upon the end run theory of preemption. But the point is, we're sort of approaching it from the state perspective. Let's assume we don't have to deal with preemption. And from the state law perspective, the problem you have here is that you've got a fraud claim against City Mortgage, and fraud claims, I don't believe, are preempted by HAMP. Well, Your Honor, Judge Chesler concluded that they were. But how so? He reached – What support is there for that in any other court? There's trial court support throughout the country, Your Honor, for the end run theory of preemption, which means that because Congress did not expressly provide a remedy within HAMP – Fraud or end run theory, Ray, other claims? I believe all claims, Your Honor. The trial court cases throughout the country do not distinguish between fraud or contract cases. I have a hard time looking at that statute, other than the language about the secretary, which seems to me it's a stretch to take the language about the secretary and the EES and then extrapolate that into some kind of congressional intent to preempt. But I'm also skeptical that this is a situation where there is either – it's certainly not expressed preemption, unless you're relying upon the language about the secretary and EES, but even implied preemption. I just don't know how – what accomplishes that, because in order – if a lender complies with HAMP, it would, I assume, get around the kinds of allegations that would lead to a meritorious fraud or consumer claim. So I don't see any conflict between complying with the federal statute or being in a situation where acting in a manner which is consistent with the federal statute would make it impossible to comply with the state statute, which is the usual kind of implicit preemption that arises under conflict or obstruction preemption. Maybe I'm missing something. I have a hard time seeing it here. He's saying you're relying upon WIGGD. Well, he said, did Chesler rely upon WIGGD? I just don't read that case that way. Your Honor, we do not rely upon WIGGD. We think that WIGGD is distinguishable. And WIGGD, the Seventh Circuit, obviously concluded that end-run preemption does not apply, therefore disagreeing with Judge Chesler's conclusion. But on HAMP, Your Honor, we would submit, and this was not argued below, but Judge Chesler obviously concluded that preemption applied. We believe that this court can find an alternative reason so long as Judge Chesler's reason was correct. Was that obstacle preemption applies here, Your Honor? I thought your argument in your brief was that conflict preemption applies to state law claims if they require more than the loan modification HAMP procedure. That's correct, Your Honor. So you're now saying something different than that, aren't you? Well, no, that is the obstacle preemption prong of conflict preemption. And our argument is that if state law requires lenders to go further than HAMP requires, then there is a conflict between state law and federal law. What's the conflict? Well, the conflict is that lenders are incentivized to participate in HAMP by being paid $1,000 per loan modification. Okay. And they will conceivably withdraw from participating in the HAMP program if they have to worry about 50 different state laws potentially ensnaring them in lawsuits throughout the country. They want certainty of complying with the HAMP program and being sure that they're not going to be sued under the New Jersey Consumer Fraud Act or any Consumer Fraud Act throughout the country. Okay. But I think we're mixing apples and oranges. When you said that some district courts go the other way, that's with respect to field preemption. And then conflict preemption, you're saying that you're not relying on the Seventh Circuit case, why good, why God, whatever. But then your brief seems to say, no, you are. Anytime that a state law provision requires more than is required under HAMP, that's conflict preemption. That's correct, Your Honor. That's what your brief said, but you said something different just a moment ago, didn't you? I can't stand before Your Honor and rely upon why good because it concluded differently than Judge Chesler. So we think the case is factually inopposite in any event. Our argument here, Your Honor, is that the obstacle preemption prong of conflict preemption applies because the plaintiffs here are saying, city mortgage, you need to go beyond what HAMP requires. You need to give us a, quote, favorable loan modification, end quote. And our position is, Your Honor, we complied with HAMP. We offered them three separate permanent loan modifications. But the failure, it's more than that. The failure to provide a favorable modification wouldn't give rise to a cause of action. That's correct. What they're saying gives rise to the cause of action is the manner in which the loan modifications were procured, solicited, and communicated. But HAMP does not necessarily require that, nor does consumer fraud law require that. That state law claim is preempted. I mean, how so? Your Honor, again, I go back to the pleading. And what they're saying here is you offered us, you complied with HAMP. You offered us three permanent loan modifications, but you didn't, you need to offer us a better permanent loan modification. And in connection with negotiating the permanent loan modifications, you made me speak to ten different representatives. And if state law requires a mortgage loan servicer to go beyond what HAMP requires, and they concede that City Mortgage complied with HAMP, then we submit that that would be conflict preemption. Because if we're in the HAMP rubric and we comply with HAMP, we can't then have to worry about complying with state law, which they argue requires us to do more than what HAMP requires. Does HAMP require the person to say you should default? The borrowers need to submit a hardship affidavit. Does HAMP require that the person say you have an option of defaulting? They need to certify either they're in default or about to go into default. And that's through the form 4506. That's a little different than saying you should default. In other words, the reason they're there is because they fear very much they're about, they're on the verge of going into default like any minute. But HAMP doesn't require that you should default. It just says that you should. The idea is to go to them before you default, isn't it? I'm in trouble. I've lost my job, whatever it might be, and I need to work something out here. That's correct, Your Honor, but obviously there needs to be either a default or an impending default in order to be considered for a HAMP modification. Lenders aren't going to be soliciting their consumers for modifications unless there's some indication that the loan is in trouble, that the loan is about to go into default. So, again, HAMP does require that the borrowers either be in default or about to go into default, and we would submit that that's thus not a misrepresentation, what the borrowers were allegedly told in this case.  Go ahead, Dick. On to this breach of duty of good faith and fair dealing. In the Wigod case, the Seventh Circuit allowed their claim to survive the 12B6 motion because although the bank offered plaintiff a TPP, it didn't offer them one that they could have. It wasn't permanent. It wasn't useful. Here, the Delucas are saying the same thing. We got the runaround. We never got anything that was any better than what we had with Quicken. Now, the pleadings indicate that Sharon's son of Quicken, dealing with her, they knew that the Delucas were only making $80,000. So you said it was not on the record. Is it not on the record that you knew, your clients knew? Because it's in the pleadings that they were making $80,000. That fact is in the record, Your Honor. I believe what Chief Judge McKee was asking me was what their yearly mortgage payments would be in total, and I'm not sure that that is in the record. On the breach of the implied covenant. But if you knew that they were making $80,000, why isn't a breach of good faith, fair dealing for you to go all this way and not offer them anything they can afford? I mean, they can't pay $60,000 or whatever. They're not making that kind of money. So why is that not fair dealing or unfair dealing? Your Honor, it's not unfair dealing because my client's city mortgage complied with HAMP. There is a waterfall process. There's an analysis that a mortgage servicer is required to go through. They ran the calculations, and they offered the Delucas three separate permanent loan modifications. So I would submit that it can't be bad faith if my client complied with the HAMP regulations and the Delucas couldn't afford the payment that the calculations that were concluded based on the calculations. We complied. We offered them three permanent loan modifications. I don't believe we were required to do anything more than that. Thank you. It is curious though how that waterfall process could come up with this kind of a number. Even if you factor in the net asset value and all the kinds of things that go into that waterfall, I guess it's a four-step process or four-factor process. For that process to result in this kind of a number, you wonder what good the process is. Your Honor, I believe in the record it's that the trial period plan payments were approximately $2,500 a month. And that's $30,000 a year. So I'm not sure that they try to get to 31% of monthly income. That's the goal in the HAMP analysis. I'm not sure that $2,500 is unreasonable if somebody is making $80,000 a year, as is alleged. But the complaint does not allege what the Delucas were making at the time that they were offered the loan modifications. They say they were making $80,000 at the time the loans were originated by Quicken. So that fact is missing. Thank you. Thank you. Mr. Hart, you have a few minutes. Good morning, Your Honors. May it please the Court, David Hart on behalf of the so-called Quicken defendants in this matter. I have to start with I think perhaps we've gotten a little bit downstream, and we need to sort of put this whole situation into context here. What has been pled by the plaintiffs in their amended complaint is that they were in financial distress. And I say that with emphasis because it was recited three times in the amended complaint. The plaintiffs were in financial distress. The plaintiffs, the appellants herein, set out to find a new loan to replace a loan that was in place at that time. And the reason we know this is because we know how the money was raised. Well, what was the unconscionable behavior that the Delucas alleged in their amended complaint with respect to the New Jersey Consumer Fraud Statute? As I understand it, there were three things alleged. One, that their questions were deflected. Two, that they were rushed through at closing. This is in connection with the original loan? Yes. This is what the complaint says. I'm not asserting these as being truthful, only that they're alleged. And three, that during the closing of the loan transaction, husband and wife plaintiffs were in separate rooms at plaintiff's place of business. Now, that's what I understand is the unconscionable practice that's been alleged. Now, what are you alleging that they claimed for the first time on appeal, then? Well, initially, if you read the complaint and in the proceedings in the trial court, the discussion was about fraud. State court fraud, common law fraud. Now, perhaps the terms unconscionable commercial practice had been stated somewhere, but that isn't what this case was about. Now, before your honors, at the appellate level, that apparently is what the case is about. Let me count one of the amended complaint. It seems to make a fraud accusation, does it not? It makes a fraud accusation, absolutely. But the case wasn't about, at the motion hearing and in the motion papers for the Rule 12 motion, the emphasis was not on an unconscionable commercial practice. But really, take that as what's at play here. In order for there to be an unconscionable commercial practice, what has to be pled is a lack of good faith, a lack of honesty in fact, and a lack of observance of fair dealing. And that's the Cox v. Sears, Sears-Rosebuck case that's cited by the appellants here. But more, in addition to that, there has to be an ascertainable loss. And probably most importantly for us now, there has to have been a causal nexus pled between this unlawful or unconscionable. Assume for the moment, obviously without conceding anything, that they do go to a Quicken employee, and the Quicken employee says that, yeah, you're making 80, let's times three that, let's say it's 240, and that will get you a loan for the type of house that you want. What kind of claim would you have if that were true? Well, we've cited some law in our brief, and there was a discussion both at the lower court and now again here today. That isn't – the loan application is a representation of the borrower. It is not a representation of the lender. But if the borrower – But if the – in my example, again, you're not conceding this. If, in my example, the person – the employee suggests to them that you should – you can triple this and get this kind of loan, it would sound as if the employee is being at least complicit if the Delucas agree to do that, isn't it? Wouldn't that be the case? I mean, you're right. I would never concede anything, but the wise lawyer does. Perhaps that is the case, Your Honor. However, the instance here is you've got borrowers who are signing a loan application, making a representation. It's under some pretty clear language that we're doing this, we're representing to you these are truthful assertions, and that's what the loan application does. But these are the kind of things that got, for example, countrywide in, you know, deep kimchi. I mean, they were doing, you know, maybe slightly worse than Ninja Loans. No income, no jobs, or no assets. But here you're inflating the income. Wouldn't that seem to fit into the same type of claims that would be – have been made against, for example, countrywide? I would contend that even the most unsophisticated borrower understands the more they make, the more money they can borrow. And that is clear. So when a borrower goes and signs an application for a loan, and we've cited law in the briefs in this matter, this is a representation of the borrower. They're making that statement. So, no, I don't believe that that would constitute the basis for the claim here. But I think we need to focus, though, on the notion that there needs to be a causal nexus between an unconscionable practice, if it exists – apparently it's been pled here – and an ascertainable loss. And the reason that is a key point here is because it hasn't been pled. And that's really the most important part, at least for a Rule 12 motion. But more importantly, in the bigger picture, it doesn't exist. The plaintiffs here, the loan that they received here paid off $593,000 to their existing underlying loan, $17,000 for American Express, $17,000 to another credit card, $16-some-thousand to the state for taxes. So not only is there not an ascertainable loss, if anything, this loan in question benefited the plaintiffs. But there can be no nexus between an unconscionable practice because there isn't one pled here. And so notwithstanding whether – and, Your Honor, I get the point that you're taking, that if perhaps an employee of a lender said, hey, let's get together, we're going to figure out a way to misstate all the facts here and get you a loan, which I'm going sort of off on a tangent. Even if that occurred, this loan benefited the plaintiffs. It didn't occasion a loss, and most importantly, no nexus between any unconscionable practice and any ascertainable loss has in any way been pled here. And so the grant of the motion below was appropriate, and Your Honors should affirm that ruling. Thank you, Your Honor. Thank you. Your Honors, I just had two brief points. You know, we ended up with Mr. Hart pretty much where we ended up or were at one point with you. How were they harmed? What is the causal relation between the action and a purported harm to the DeLucas? Well, ultimately, Your Honor, if they cannot get any relief with this case that they filed, ultimately, the likelihood of them losing their house and not being able to stay in that home becomes a definite, not even a probability. It will happen. But when they got the loan initially, were they harmed? I would not say initially, Your Honor. Yeah, that's a pool of quicksand you just put your foot in. They weren't harmed initially. When did the harm creep in and what caused it? I would say the harm occurred when these appellants realized that they were, they had no choice but to default to save their home. The conduct of the defendants remained the same. The contract you're basing your claim on was the same before and after the harm. It struck me this morning that usually in the situation of fraud, the remedy that's sought is rescission. Now, you're not asking for rescission. It's obvious why you're not. But why doesn't that go exactly to Mr. Hart's argument that you don't really want rescission here because rescission doesn't help you and that puts you in an even deeper hole. But the fact that rescission is not a remedy that would help your clients, why doesn't that basically prove the point that Mr. Hart and, to a lesser extent, Mr. Hall, you're making, that is that the clients benefited from the loan? And if it was a benefit, then where's the causal nexus? Well, in terms of the amount of the loan and it paying off previous debts, the allegation is that this loan was used as a debt consolidation tool. So, in effect, if they would not have consolidated all their debts, they could have filed a Chapter 7 bankruptcy to get rid of all their unsecured debt. But that is another issue that's really in the complaint. And that's not an option now? I think since the arrearage has skyrocketed to where it is today, Chapter 13 would in no way be an option. No, he's mentioned 7. 13 probably wouldn't be. And, Your Honors, the only other point I would make, I find it interesting that today when the homeowner does apply for HAMP or an in-house modification, very quickly the lender will ask you to sign or execute a 4506-T form, which within a couple weeks will get that lender confirmation of what the individual makes. So, even if it were just an error, you know, let's... That doesn't help you because then you're arguing that the victim of the fraud is not the clients but the defenders. They're the ones who were defrauded by the misrepresentations by relying upon an inflated income and inflated assets. That what you just said does not advance your cause that much. That's basically what Mr. Hart was arguing about, who the victim is. Well, ultimately, if these homeowners and other homeowners in the same situation aren't extended the credit and aren't being put in the home to begin with, you know, that's, I think, another way of looking at this. You're being given this opportunity, this American dream, you know, here's a mortgage, go buy a house, and you're in this home that you're creating a home over years and you're used to it. If you weren't given that opportunity in the first place, then you're not losing it. You know, but here you're being given this opportunity through this reckless lending. You're in the home and then now it's, I mean, it is 2020 hindsight, unfortunately. Okay, Mr. J. Thank you very much. Thank you. Have a good day. Thank you, my dear advisor. I thank all of you. It's a very interesting and tragic case.